# STATE OF MICHIGAN

# COURT OF APPEALS

---

MILDRED JONES, Personal Representative of the
ESTATE OF AMOS JONES,

     Plaintiff-Appellant/Cross-Appellee,

v

BOTSFORD CONTINUING CARE
CORPORATION,

     Defendant-Appellee/Cross-
     Appellant,

and

DR. THOMAS SELZNICK and LIVONIA
FAMILY PHYSICIANS, PC,

     Defendants-Appellees.

FOR PUBLICATION
April 7, 2015
9:05 a.m.

No. 317573
Oakland Circuit Court
LC No. 2012-130023-NH

---

Before: DONOFRIO, P.J., and FORT HOOD and SHAPIRO, JJ.

FORD HOOD, J.

Plaintiff, Mildred Jones, as the personal representative of the estate of her husband, Amos Jones, appeals from the trial court order granting summary disposition in favor of defendants, Botsford Continuing Care Corporation, Dr. Thomas Selznick, and Livonia Family Physicians, PC, in this medical malpractice and wrongful death lawsuit. For the reasons set forth in this opinion, we reverse and remand.

## I. FACTS

Amos Jones, an elderly man, was admitted to Botsford Continuing Care (BCC), an extended care facility, for care following hospitalization for a stroke. As a result of the stroke, Jones had difficulty swallowing and so during his hospitalization, a percutaneous endoscopic gastrostomy (PEG) tube was surgically inserted through his abdominal wall and into his stomach in order to provide nutrition. When Jones was admitted to BCC on November 12, 2007, the PEG

tube was in place. According to the hospital nursing progress notes, during his stay and while in an agitated state, Jones pulled out the PEG tube. The PEG tube was reinserted approximately eight hours later. Plaintiff's complaint alleged that the PEG tube was improperly reinserted and that as a result, gastric contents and nutritional material were released outside Jones's stomach and into his abdominal space, causing a massive infection that killed him.

Prior to filing suit, pursuant to MCL 600.2912b(1), plaintiff mailed a notice of intent to file claim to the individuals and entities later named as defendants. The notice satisfied the requirements of MCL 600.2912b(4).

Pursuant to MCL 600.2912b(7), each recipient of the notice was required to "furnish to the claimant . . . a written response[.]" The statute requires that, like plaintiff's notice, a potential defendant's written response contain four sections, one of which states "[t]he factual basis for the defense to the claim." MCL 600.2912b(7)(a). However, defendants each failed to send a written response, thus violating this statutory mandate.

When plaintiff filed the complaint initiating this lawsuit, her attorney attached two affidavits of merit as required by MCL 600.2912d. One of the affidavits attested to physician malpractice and was signed by Dr. Gregory Compton, who in his affidavit stated that at the relevant time he "was a licensed and practicing INTERNAL MEDICINE and GERIATRIC MEDICINE Doctor." The other affidavit attested to nursing malpractice and was signed by Amy Osterlink, who averred that she was an "R.N." and "was . . . licensed and practicing nursing."

As required by MCL 600.2912e, defendants filed affidavits of meritorious defense. Two affidavits were filed in response to the claim of physician malpractice. The one submitted by BCC (who plaintiff alleged was liable for any negligence by Dr. Selznick under an agency theory) was signed by Dr. Alan Neiberg, who averred that during the relevant time period he was "board certified in internal medicine, and . . . devoted a majority of [his] professional time to the active clinical practice of my profession of internal medicine." The one submitted on behalf of Dr. Selznick personally was signed by Dr. Selznick himself and averred that he is "certified by the American Board of Family Practice and ha[s] a Certificate of Added Qualification in Geriatrics."

BCC's affidavit of meritorious defense filed in response to the claim of nursing malpractice was signed by Marguerite Debello, who averred that she was "a registered nurse" and during the relevant time period "devoted a majority of my professional time to the active clinical practice of my profession of nursing."

MCL 600.2912d(1) and MCL 600.2912e(1) respectively require that the affidavits of merit and meritorious defense be "signed by a health professional who the [party]'s attorney reasonably believes meets the requirements for an expert witness under section 2169." Thus, for the affidavit as to Dr. Selznick to comply with MCL 600.2912d and MCL 600.2912e, the respective attorneys must have had a reasonable belief that the affiant, per the requirements of MCL 600.2169(1)(a), "specialize[d] at the time of the occurrence that is the basis for the action

-2-

in the same specialty as the party against whom or on whose behalf the testimony is offered."[1] MCL 600.2912(1)(a) does not apply to nurses, *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 18, 22; 651 NW2d 356 (2002), but MCL 600.2912(1)(b) does, as it applies to all health professionals. This provision requires that during the year preceding the incident, the testimonial expert have devoted a majority of his or her professional time to "[t]he active clinical practice of the same health profession in which the [defendant] . . . is licensed."

Defendants moved for summary disposition under MCR 2.116(C)(10), asserting that the affidavits filed by plaintiff's counsel did not satisfy MCL 600.2912d because the affiants did not meet the requirements of MCL 600.2169(1)(a) and (1)(b), respectively, and that plaintiff's counsel could not have had a reasonable belief that they did. BCC asserted that plaintiff's affidavit of merit alleging nursing malpractice should have been signed by a licensed practical nurse (LPN) and that plaintiff's counsel could not have reasonably believed that a registered nurse (RN) could offer standard of care testimony. Both BCC and Dr. Selznick asserted that plaintiff's affidavit of merit alleging physician malpractice should have been signed by a family practitioner and that plaintiff's counsel could not have had a reasonable belief that Dr. Compton had the proper qualifications.

The trial court ruled that the affiants did not satisfy the requirements of MCL 600.2169(1) and, on this basis, dismissed the case. The court did not, however, address plaintiff's argument that her counsel had a reasonable belief that the affiants met the testimonial requirements.[2] Plaintiff appeals from that ruling and BCC cross-appeals on the grounds that the dismissal should have been with prejudice.[3]

## II. STANDARD OF REVIEW

A trial court's ruling on a motion for summary disposition presents a question of law reviewed de novo. *Titan Ins Co v Hyten*, 491 Mich 547, 553; 817 NW2d 562 (2012). Questions of statutory interpretation are also reviewed de novo including the statutory requirements for affidavits of merit. *Lucas v Awaad*, 299 Mich App 345, 377; 830 NW2d 141 (2013). "Our goal

---

[1] This requirement may also be met if the proffered expert has spent the relevant period instructing students in the relevant field at a health professional school or accredited residency or clinical research program. MCL 600.2169(b)(*ii*). This aspect of the statute is not relevant to the issues in this case.

[2] In fact, the trial court indicated that it believed plaintiff's selection of Dr. Compton as his standard of care expert was reasonable, but it did not address the significance of that finding.

[3] Before the case was appealed to this Court, plaintiff resubmitted her respective affidavits, this time signed by a family practitioner and an LPN. The parties dispute whether these constituted amended affidavits for purposes of MCR 2.112(L). While we do not subscribe to the dissent's cursory treatment of this question, we need not address it ourselves given our conclusion that the originally filed affidavits were sufficient.

when interpreting and applying statutes or court rules is to give effect to the plain meaning of the text." *Ligons v Crittenton Hosp*, 490 Mich 61, 70; 803 NW2d 271 (2011).

## III. ANALYSIS

Whether an expert may provide standard of care testimony at trial is governed by MCL 600.2169. However, whether an affidavit of merit signed by an expert is adequate is governed by MCL 600.2912d. This provision requires that plaintiff's counsel "reasonably believes" that the affiant "meets the requirements of MCL 600.2169[,]" not that the affiant actually meet those requirements for purposes of trial testimony. "The Legislature's rationale for this disparity is, without doubt, traceable to the fact that until a civil action is underway, no discovery is available. See MCR 2.302(A)(1)." *Grossman v Brown*, 470 Mich 593, 599; 685 NW2d 198 (2004).

Both this Court and the Supreme Court have been careful to distinguish these standards and to recognize that "at trial the standard is more demanding because the statute states that a witness '*shall not* give expert testimony' *unless* the expert 'meets the [listed] criteria' in MCL 600.2169(1)." *Id*. (Emphasis added). By contrast, the issue for purposes of MCL 600.2912d is not whether the expert signing the affidavit of merit may ultimately testify at trial. The controlling question under MCL 600.2912d is whether plaintiff's counsel had a reasonable belief that the affiant would qualify. The fact that the Legislature used the "reasonable belief" language demonstrates that there will be cases in which counsel had such a reasonable belief even though the expert is ultimately shown not to meet the criteria of MCL 600.2169(1).

In *Brown v Hayes*, 477 Mich 966; 724 NW2d 470 (2006), the Supreme Court reiterated this point. It concluded that even where the expert in question did not qualify under MCL 600.2169, the affidavit should not be stricken where counsel had a reasonable belief that the expert did qualify. *Id*. Indeed, in *Brown*, the attorney had not made an error of fact (as in *Grossman*), but had wrongly but reasonably construed the statutory requirements. *Id*.

This Court has similarly observed the differing tests between an expert's qualification to actually testify at trial and the reasonable belief of counsel at the affidavit stage. In *McElhaney v Harper-Hutzel Hosp*, 269 Mich App 488, 497-498; 711 NW2d 795 (2006), we held that plaintiff's expert did not qualify under the statute and so should be stricken from the witness list. However, as to the propriety of the affidavit of merit signed by that expert as to alleged malpractice by a nurse midwife, we concluded that "plaintiff's attorney's belief that an obstetrician/gynecologist met the requirements for an expert witness under § 2169 was reasonable." *Id*. at 495-496. Thus, the issue is not whether the attorney's judgment proved to be incorrect, but rather whether his belief, though erroneous in hindsight, was reasonable at the time.

In light of these principles, we now review the trial court's conclusion that the affidavits of merit filed with plaintiff's complaint did not comply with MCL 600.2912d. We will address separately the nursing affidavit of merit and the physician affidavit of merit. Plaintiff's claims against BCC are based upon the actions of two separate agents, i.e., the relevant nurse(s) and its staff physician, Dr. Selznick. Plaintiff's claims against Dr. Selznick and his practice are based solely upon his individual actions.

## A. NURSING MALPRACTICE

As to the claims of nursing malpractice, we conclude that the trial court erred because it was not unreasonable for plaintiff's counsel to obtain an affidavit of merit from an RN.

BCC's argument that the case must be dismissed rests first and foremost on its assertions that the caregiver who reinserted the PEG tube was an LPN and that this information was available in the medical records. However, defendant has offered no *evidence* that this assertion is true. Indeed, a review of the medical records makes clear that the relevant caregiver is not identified as an LPN nor by name.

BCC's sole basis for its assertion is a single page of handwritten nursing notes dated November 15, 2007, much of which is illegible. There is a note timed at 12:00 a.m. that appears to have been signed by an LPN, albeit with an illegible signature. BCC claims in its brief that this nurse reinserted the PEG tube. However, this assertion is simply not supported by the nursing notes, insofar as they can be deciphered, or by any other proofs or affidavits. Significantly, the 12:00 a.m. note does not say that the nurse on duty then reinserted the tube. Rather, reinsertion of the PEG tube is first referenced in a nursing note written eight hours later, at 8:00 a.m., in which a different author writes, "PEG tube replaced." The 8:00 a.m. note is signed, but the signature is illegible and clearly does not contain a notation as to whether the person making the entry is an LPN or RN. It is also readily apparent upon observation of the 8:00 a.m. note that it was not written by the same individual who wrote the 12:00 a.m. note.[4]

Even if we were to accept as true BCC's unsupported assertion as to the identity of the relevant caregiver, a proposition wholly inconsistent with our standard of review, it would not alter the outcome of this appeal because plaintiff's attorney had a reasonable belief that the affiant could testify.

First, given the limited evidence available at the time the affidavit of merit was filed, it would have been reasonable for plaintiff's counsel to have concluded that the relevant nurse was an RN. As stated by our Supreme Court in *Grossman*, 470 Mich at 599-601, when determining the reasonableness of an attorney's belief at the affidavit of merit stage, we look to the resources available to that attorney at the time the affidavit was prepared. As just noted, the medical records did not provide the relevant information. Moreover, BCC never complied with its statutory duty to respond to plaintiff's notice of intent to file claim with a written statement providing "[t]he factual basis for the defense to the claim" in which it presumably would have

---

[4] The next nursing note was written at 2:15 p.m. on the same day. The signature of the note's author is again illegible and again no medical title appears. It states that the patient's family visited and found the patient short of breath. The 2:15 p.m. note's author writes that he or she then placed a call to a Physician Assistant who did not answer. He or she then advised the nursing supervisor on the unit who directed that Jones be transferred to the hospital emergency department. According to the note, at that time, Jones was "no[t] really responding."

identified the caregiver who reinserted the PEG tube and his or her qualifications. MCL 600.2912b(7)(a). Indeed, the reasonableness of the belief that an RN could properly sign the affidavit of merit in this case is demonstrated by the fact that BCC's affidavit of meritorious defense was signed by an RN, not an LPN. Given that BCC's attorneys, who (unlike plaintiff's counsel) had full access to hospital staffing records and the relevant caregivers, concluded that an RN was the proper affiant, it would certainly seem that the same judgment, when made earlier by plaintiff's counsel with far less information, was a reasonable one.

Second, we find reasonable plaintiff's counsel's legal conclusion that an RN may offer standard of care testimony against an LPN. Whether an RN may ultimately offer such testimony at trial is not before us and we do not decide that issue, but plaintiff's counsel's conclusion that an RN was a proper affiant, even if the relevant actor was an LPN, would not have been unreasonable given the fact that the issue has not been definitively addressed and there is law that supports his conclusion.

Indeed, the statutory definitions of LPN and RN support this conclusion, as does the relevant case law. Both RNs and LPNs are licensed in the "practice of nursing." MCL 333.17201(1)(a), which defines this practice, provides:

> "Practice of nursing" means the systematic application of substantial specialized knowledge and skill, derived from the biological, physical, and behavioral sciences to the care, treatment, counsel, and health teaching of individuals who are experiencing changes in the normal health processes or who require assistance in the maintenance of health and the prevention or management of illness, injury or disability.

The same section goes on to define the practice of an LPN and an RN as follows:

> (b) "Practice of nursing as a licensed practical nurse" or "l.p.n." means that practice of nursing based on less comprehensive knowledge and skill than that required of a registered professional nurse and performed under the supervision of a registered professional nurse, physician or dentist.

> (c) "Registered professional nurse" or "r.n." means an individual licensed under this article to engage in the practice of nursing which scope of practice includes the teaching, direction, and supervision of less skilled personnel in the performance of delegated nursing activities.

Consistent with these definitions, MCL 333.17208 provides that "[t]he practice of nursing as a licensed practical nurse is a health profession subfield of the practice of nursing."

These statutory definitions make clear that any work that may be performed by LPNs may also be performed by RNs. Indeed, RNs can direct and supervise LPNs in the performance of their duties. Each is wholly engaged in the "practice of nursing" and neither has any specialty

-6-

training.[5] The only difference is the extent of their general training and authority. The situation appears analogous to that of a physician specialist as to a resident physician in specialty training. In *Bahr v Harper-Grace Hosps*, 448 Mich 135; 528 NW2d 170 (1995), the Supreme Court held that a physician who is a fully qualified specialist may, under MRE 702, testify as to the standard of care applicable to a resident physician training in that specialty. See also *Gonzalez v St John Hosp & Med Center (On Recon)*, 275 Mich App 290; 739 NW2d 392 (2007).

In sum, we conclude that the trial court erred in dismissing the claims against BCC that are based upon allegations of nursing malpractice. We reach this conclusion for each of the following reasons: (a) there is a question of fact whether the nurse in question was an LPN or an RN; (b) given BCC's failure to respond to the notice of intent and identify whether the nurse in question was an LPN or RN, that information was not reasonably available to plaintiff's counsel when the complaint and affidavits of merit were filed, and; (c) it would have been reasonable for plaintiff's counsel to conclude that an RN could offer testimony as to an LPN.

## B. PHYSICIAN MALPRACTICE

The claims of physician malpractice apply to Dr. Selznick, his practice, and BCC through agency.

As discussed earlier, the question before us is not whether Dr. Compton may offer standard of care testimony at trial. The sole question is whether at the time he prepared the affidavit of merit, plaintiff's counsel reasonably believed that Dr. Compton met the requirements of MCL 600.2169(1)(a). Similar to our conclusions as to the nursing issue, we conclude that counsel's belief was reasonable and we find that there were both factual and legal grounds for that belief.

Factually, plaintiff's expert affiant attested that at the relevant time, he was a specialist in two areas of medicine, one of which was geriatric medicine, and that more than 50% of his practice was in that specialty. Plaintiff's counsel believed that at the relevant time, Dr. Selznick was also a specialist in geriatric medicine. Dr. Selznick now asserts that his only specialty is in family medicine and that he is not a specialist in geriatric medicine. We conclude, however, that plaintiff's counsel's conclusion that Selznick was a geriatric specialist was a reasonable one, at least at the pre-suit stage.

First, Dr. Selznick's professional biography on his own website affirmatively states that he is "board certified in . . . geriatrics." We find it difficult to accept that a doctor may publicly advertise himself as having a particular specialty and then claim that no one could have reasonably believed that his assertion was true.

Second, given that plaintiff was an elderly man in a nursing home, it would be reasonable for plaintiff's counsel to have concluded that the one most relevant specialty was geriatric

---

[5] Unlike a nurse midwife or a nurse practitioner, neither an RN nor an LPN is within a "health profession specialty field." MCL 333.16105(3).

medicine. Indeed, Dr. Selznick was the medical director of the nursing home, a position which one would reasonably conclude could not be obtained by physicians who do not specialize in geriatric medicine.

Third, plaintiff's notice of intent made absolutely clear that plaintiff's counsel believed that Dr. Selznick was a specialist in geriatric medicine and that geriatric medicine was the specialty that he was practicing at the time in question. The notice further asserted that the relevant standard of care was the one applicable to geriatric medicine specialists. Upon receipt of the notice of intent, Dr. Selznick had a statutory duty to respond with "a written response that contains a statement of each of the following: (a) The factual basis for the defense to the claim [and] (b) The standard of practice or care that the health professional . . . claims to be applicable to the action[.]" MCL 600.2912b(7). Had Dr. Selznick complied with this mandate and had he actually asserted what he now claims, i.e., that he is not a geriatric medicine specialist, plaintiff's counsel would have filed an affidavit from a physician whose specialty qualifications matched those claimed by Dr. Selznick. Failure to have provided the mandatory response, while not an active assertion of agreement with plaintiff's understanding of the relevant expertise and, thus, not a formal admission, surely provides an additional reason (along with Dr. Selznick's website claims and his position as medical director of a geriatric nursing home) for plaintiff's counsel to have reasonably concluded that Dr. Selznick is a specialist in geriatric medicine.[6]

Dr. Selznick does not dispute that he has special training and experience in geriatric medicine. He also does not dispute that he has a certificate of added qualification in geriatric medicine. Nevertheless, he asserts that this is not the equivalent of a board certification. Indeed, he appears to assert that there is no such thing as a specialty in geriatric medicine and that any conclusion that there is such a specialty is unreasonable. We disagree.

In the decade following the passage of 1993 PA 78, many issues arose concerning the exact nature of the requirements it adopted in medical malpractice cases. Many of these difficulties arose from questions about expert qualifications, particularly the issue of "matching" specialties. Most of these issues were resolved by our Supreme Court in *Woodard v Custer*, 476 Mich 545; 719 NW2d 842 (2006). However, some issues escaped conclusive treatment in *Woodard*. One of these remaining issues is what constitutes an expert "match" where a physician has a board certification, but also carries a certificate of added qualification. This is particularly true when, at the time of the occurrence that is the basis of the medical malpractice

---

[6] The dissent, in footnote 6, suggests that Dr. Selznick did file a "response" to plaintiff's notice of intent. The document to which the dissent refers is a one-paragraph letter denying that Dr. Selznick bears any responsibility for Jones's death and is signed by an untitled employee of "the Third Party Administrator for the Freedom Specialty Insurance Company." This letter is clearly not a response within the meaning of MCL 600.2912b(7), which specifically provides that a written response must comply with the requirements of MCL 600.2912b(7)(a)-(d), which this letter does not even attempt to do. The letter is not a response to plaintiff's notice of intent any more than a letter of accusation from a decedent's family, without the content required by MCL 2912b(4), is a "notice of intent." Indeed, the letter is wholly silent as to what specialty Dr. Selznick asserts he practices when treating infirm patients in the nursing home he directs.

action, the physician was practicing in the specialty defined by the certificate of added qualification.

Defendants rely on *Halloran v Bhan*, 470 Mich 572, 575-580; 683 NW2d 129 (2004), where the Supreme Court held that plaintiff's medical expert should not be permitted to testify at trial[7] because, as a board-certified specialist in anesthesiology, he did not "match" the qualifications of defendant, who was a board-certified specialist in internal medicine, even though they each possessed certificates of additional qualification in critical care. However, *Halloran* was decided two years before *Woodard* and the decision was circumscribed by the fact that all parties to the case agreed that a certificate of added qualification did not constitute a board certification. Thus, in *Halloran*, the legal import of a certificate of added qualification was not an issue in dispute. See *id*. at 575 ("The parties do not dispute that the subspecialty certification [of added qualification] is not 'board certification' for purposes of [MCL 600.2169]."). The plaintiff argued that his expert, who by the parties' agreement was only board certified in anesthesiology, should be permitted to testify against an internal medicine specialist simply because the case arose in a hospital's critical care unit and the parties shared a "subspecialty" by virtue of their matching certificates of added qualifications. *Id*. at 575-576. All three Court of Appeals judges concluded as a matter of law that "critical care medicine" cannot be considered a specialty because, as the parties agreed, there is no board certification is available in it.[8] *Halloran v Bhan*, unpublished opinion per curiam of the Court of Appeals, issued March 8, 2002 (Docket No. 224548), p 2; (HOEKSTRA, J., dissenting), p 4. The majority concluded that "[b]ecause there is no board certification for critical care medicine, the last sentence of § 2169(1)(a) does not apply to the present case." *Id*. at p 3. The majority therefore held that the requirement for specialized expert testimony did not apply at all. The dissent agreed that critical care medicine is a not a specialty, but concluded that the specialty expert requirement still applied, thus requiring a "match" for defendant doctor's board certified specialty in internal medicine. *Id*. at p 4. The Supreme Court essentially adopted the analysis of the dissenting Court of Appeals judge, noting that "[t]he parties do not dispute that the subspecialty certification is not 'board certification' for purposes of the statute." *Halloran*, 470 Mich at 575. Accordingly, *Halloran* concluded that defendant's only specialty was internal medicine and that the plaintiff's expert, whose only specialty was anesthesiology, could not testify at trial as to standard of care.

Had *Halloran* been the last word on the question, we would agree with defendants that plaintiff's counsel could not have concluded that geriatric medicine is a specialty and that both defendants' and plaintiff's affiants are board-certified specialists in that field. However, *Halloran* was not the last word. In 2006, the Supreme Court decided *Woodard* along with its companion case, *Hamilton v Kuligowski*.

---

[7] There was no challenge to the affidavit of merit and so the issue of counsel's reasonable belief was not addressed in *Halloran*.

[8] While this Court and the Supreme Court have often used the term "subspecialty," it is worth noting that the term is never used in the statute and it may be that the use of this non-statutory term underlies some of the analytical challenges.

*Woodard* substantially changed the landscape in terms of what constitutes a specialty for purposes of MCL 600.2169(1)(a) and the way in which certificates of added qualification at to be construed.

First, *Woodard* held that "a certificate of special qualifications . . . constitutes a board certificate." *Woodard*, 476 Mich at 565. Thus, contrary to the parties' agreement in *Halloran*, a certificate of special or added qualification constitutes a "board certification."

Second, *Woodard* held that "a 'specialist' is someone who can become board certified . . . . [And, therefore] if the defendant's physician practices in a particular branch of medicine or surgery in which one can potentially become board certified, the plaintiff's expert must practice or teach the same particular branch of medicine or surgery." *Id*. at 561-562. Thus, if a defendant has the training and experience necessary to qualify for a certificate of special qualification, he is a specialist in that field. Putting it more directly, the Court held that "[a] subspecialty, although a more particularized specialty, is nevertheless a specialty." *Id*. at 562.

Third, *Woodard* held that where a defendant has multiple specialties, a testifying expert must only "match the one most relevant standard of practice or care—the specialty engaged in by the defendant physician during the course of the alleged malpractice, and, if the defendant physician is board certified in that specialty, the plaintiff's expert must also be board certified in that specialty." *Id*. at 560.

To put it in the form of a syllogism, *Woodard* tells us that:
a. a certificate of special qualification is a board certification;
b. thus, a certificate of special qualification in geriatric medicine is a board certification in geriatric medicine;

c. since board certification in geriatric medicine is available to physicians with the necessary training and experience, geriatric medicine is a specialty;

d. if Dr. Selznick, who is board certified in both family medicine and geriatric medicine, was practicing geriatric medicine at the time this case arose, then the "one most relevant specialty" is geriatric medicine and it is that one specialty that plaintiff's expert must match;

e. both Dr. Selznick and plaintiff's expert affiant are board certified in the one most relevant specialty, i.e., geriatric medicine.

Having laid out this reasoning, we still decline to reach the question whether Dr. Compton may testify at trial regarding standard of care. *Halloran* has not been explicitly overruled and we leave it to the Supreme Court to determine whether and to what extent *Woodard* did so.[9]

---

[9] The *Woodard* majority made little reference to *Halloran*, citing it only twice—once in reference to the de novo standard of review for statutory interpretation questions, and once for

-10-

Moreover, *Woodard* presents a somewhat different factual situation than that in the present case. In that case, the Court concluded that a physician who is board certified in pediatrics may not testify regarding a physician who is board certified in pediatrics and also has a certificate of added qualification in pediatric critical care where the action arose in the context of care in a pediatric special care unit. *Id*. at 575-577. In the companion case, *Hamilton*, the Court held that an expert who was board certified in internal medicine and had a certificate of special qualifications in infectious disease (and spent more than 50% of his time practicing infectious disease) could not testify against a physician who was also board certified in internal medicine where the action arose in the context of "ordinary" internal medicine. *Id*. at 577-578. Neither of those cases involved the precise circumstances we are presented with here—where both doctors are board certified in geriatrics and the relevant area of practice is geriatrics, but their geriatric certifications were issued by different boards.[10]

We conclude that plaintiff's affidavit of merit as to Dr. Selznick satisfied MCL 600.2912d. Our holding is limited, however, to that statute and the sufficiency of the affidavit of merit. We do not reach the question whether this expert may ultimately offer standard of care testimony at trial under MCL 600.2169 and respectfully suggest that the Supreme Court address this broader and more significant issue in an appropriate case.

For the same reason, we also deny BCC's motion to dismiss the claims against it based on allegations of physician malpractice. Indeed, the outcome is even clearer cut as to BCC, given that BCC's relevant affidavit of meritorious defense was signed by a physician who possessed only an internal medicine board certification, and no certification in either geriatric or family medicine. While plaintiff cannot have relied on this subsequently filed affidavit, the fact that BCC's counsel, who had access to greater information, concluded that a family medicine specialist was not required suggests that plaintiff's counsel's conclusion was reasonable.

---

the principal that if the defendant is board certified in the relevant specialty, the expert must also be board certified in it. *Woodard*, 476 Mich at 557, 562.

[10] The problem is further complicated by the fact that another recognized certifying body, the American Board of Physician Specialties, certifies doctors in geriatric medicine directly rather than as a certificate of additional qualification. Geriatrics is recognized as a specialty by several certifying entities. The American Board of Physician Specialties lists geriatric medicine as a fully separate specialty. See American Board of Physician Specialties, Geriatric Medicine <www.abpsus.org/geriatric-medicine> (accessed March 23, 2015). And, as the Supreme Court noted in *Woodard*, 476 Mich at 565, "nothing in § 2169(1)(a) limits the meaning of board certificate to certificates . . . recognized by the American Board of Medical Specialties or . . . the American Osteopathic Association." The statute contains no requirement that the physician-certifying organizations be identical.

## IV.  CONCLUSION

For the reasons discussed herein, the affidavits of merit filed by plaintiff's counsel complied with MCL 600.2912d.  Accordingly, we reverse and remand for further proceedings consistent with this opinion.  We do not retain jurisdiction.


/s/ Karen Fort Hood
/s/ Douglas B. Shapiro